1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                         FOR THE DISTRICT OF ARIZONA

8

9    April R. Darling,                    )    No. CV 05-3394-PHX-EHC
                                          )
10            Plaintiff,                   )    **ORDER**
                                          )
11   vs.                                  )
                                          )
12                                        )
     Michael J. Astrue,   Commissioner of )
13   Social Security,                     )
                                          )
14            Defendant.                  )
                                          )
15   _____)

16
        This is an appeal from the decision of the Commissioner of the Social Security
17
     Administration[1] to deny disability benefits to Plaintiff April R. Darling ("Darling").
18
     **I. INTRODUCTION**
19
        Plaintiff filed this case on October 25, 2005, pursuant to 42 U.S.C. § 405(g).  The
20
     Appeals Council adopted the Administrative Law Judge's ("ALJ") denial of Plaintiff's
21
     claim for disability benefits. (Tr. 11).  Plaintiff seeks judicial review of Defendant's
22
     decision denying her claim for disability benefits. (Dkt. 1).
23
        Pending before the Court are the parties' Cross-Motions for Summary Judgment.
24
     (Dkts. 14, 20).  Plaintiff requests that the Court reverse the Commissioner's decision and
25

26

27
        [1]Michael J. Astrue replaces his predecessor, Jo Anne B. Barnhart, pursuant to Fed. R.
28   Civ. P. 25(d)(1).

1  remand for payment of benefits; the Commissioner requests that the Court affirm the

2  ALJ's decision.

3  **II. BACKGROUND**

4        Plaintiff filed an application for Disability Insurance Benefits on March 27, 2001,

5  under Title II and Part A of Title XVIII of the Social Security Act. (Tr. 147-49).  Plaintiff

6  alleges in her application that she became disabled on April 23, 2000 (Tr. 147), due to

7  severe endometriosis and extreme pain in both legs. (Tr. 154).  Darling was denied

8  disability benefits (Tr. 48-49), and was likewise denied upon reconsideration. (Tr. 54).

9        Plaintiff's appeal to the ALJ, the hearing for which was held on March 19, 2003,

10  was also denied. (Tr. 69-79).  On July 18, 2003, the Appeals Council vacated the decision

11  and remanded the case.  The Council found that the ALJ's evaluation to support his

12  decision was lacking in several respects (Tr. 93), and thus directed the ALJ to better

13  evaluate, clarify, and provide rationale for the treating/examining source opinions, the

14  Plaintiff's subjective complaints, and medical/vocational expert testimony.  (Tr. 92-94).

15        Plaintiff filed an application for Supplemental Security Income under Title XVI of

16  the Social Security Act in September 2003. (Tr. 437-40).  Plaintiff's claims were

17  consolidated and a second hearing was held on October 23, 2003.  (Tr. 466-81).  On

18  November 21, 2003, the ALJ issued an unfavorable Notice of Decision finding that

19  Plaintiff was not disabled.  (Tr. 110-19).  Plaintiff again appealed.  On May 5, 2004, the

20  Appeals Council vacated the decision and remanded to a different ALJ (Tr. 138) for

21  further evaluation and consideration of Plaintiff's fibromyalgia and chronic pain

22  conditions, Plaintiff's subjective complaints, mental impairments, and Residual

23  Functional Capacity ("RFC"). (Tr. 137). Specifically, the Council repeated the need to

24  provide specific rationale for the weight accorded the treating source opinion evidence

25  and specific, legitimate reasons for rejecting treating source opinions. (Tr. 136).

26        On August 2, 2004, a third hearing was held.  (Tr. 482-524).  Plaintiff  testified, as

27  did a medical expert and vocational expert. On August 23, 2004, the ALJ issued his

28  decision, finding that Plaintiff's disorders of the back, fibromyalgia, history of chronic

pain disorder, and possible prescription narcotic addiction are "severe" impairments, but determined that Plaintiff was not disabled. (Tr. 30-39). After Plaintiff's timely Request for Review, the Appeals Council denied the Request on September 13, 2005, and adopted the ALJ's decision as the final decision of the Commissioner in Plaintiff's case. (Tr. 11-13).

Plaintiff appeals the Commissioner's decision.

## III. STANDARD OF REVIEW

"The Social Security Administration's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (citing *Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050, 1052 (9th Cir.2006); 42 U.S.C. §§ 405(g), 1383(c)(3)). "Substantial evidence is more than a mere scintilla but less that a preponderance." *Bayliss v. Barnhart,* 427 F.3d 1211, 1214 n. 1 (9th Cir.2005) (internal quotation marks and citation omitted). "[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Orn* at 630. (internal quotation marks and citations omitted).

## IV. FACTS

### A. Education and Employment Background

Plaintiff was born on April 17, 1967. (Tr. 147). She has a college degree in Christian ministries (Tr. 447) and has worked as a nanny, secretary, building maintenance management assistant, chiropractic assistant, and records management clerk in a law firm. (Tr. 167). Plaintiff stopped working as of April 23, 2000, due to intolerable pain in her legs, endometriosis, and her doctor's advice that she go on disability. (Tr. 154). She lives with her mother. (Tr. 496).

1

## B. Medical Treatment / Medical Records

2

3    Plaintiff has been treated by John Battersby, D.O. since 1999 for chronic pain

4   syndrome, endometriosis, abdominal pain and back pain.  (Tr. 294-316).  Darling was

5   diagnosed with scoliosis in December 1999 and chronic pain syndrome in January 2000.

6   (Tr. 315-16).  In March 2000, Dr. Battersby diagnosed Plaintiff with a lumbosacral sprain

7   (Tr 310), and on April 24, 2000, he recommended that she apply for short-term disability.

8   (Tr. 308).  Dr. Battersby diagnosed Plaintiff with endometriosis in November of 2000 (Tr.

9   302), and in February 2002, Dr. Battersby completed a medical questionnaire which

10  reported that Darling could only sit one hour per day, stand one hour per day and walk

    one hour per day. (Tr. 360).

11

12    In March 2002, Dr. Battersby found that Plaintiff was "totally disabled secondary

13  to chronic back and leg pain from scoliosis and chronic abdominal pain as a result of

14  endometriosis[]" and "is not able to be employed under any kind of work." (Tr. 319).  In

15  August 2002,  Dr. Battersby advised that Plaintiff suffers from limitations in her ability to

16  sit, stand, and walk due to the chronic fibromyalgia, chronic pelvic pain, and side effects

17  from her medication. (Tr. 372-373).  Again in April 2003 and August 2004, Dr. Battersby

18  opined in Medical Assessment questionnaires that Plaintiff is severely affected in her

19  ability to function due to chronic back pain from the scoliosis[2] and fibromyalgia, and her

20  chronic pelvic pain caused by endometriosis.  (Tr. 399-402, 429).

21    Dr. Schurgin, a pain management specialist, started treating Darling in 1999.  In

22  2000, Plaintiff had an accident where she fell over a pile of wood. (Tr. 214).  The

23  accident  resulted in numbness and pain in Plaintiff's left extremities, for which she

24  received a Vicodin prescription in the emergency room. *Id.*  Although Plaintiff notified

25

26    [2]Plaintiff's scoliosis is supported by a cervical spine X-Ray taken in January 2003 that
    revealed "some disk space narrowing and posterior riding at the C5-6 interspace . . ." (Tr.
27  371).  A thoracic spine X-Ray revealed a "moderate scoliosis with convexity to the patient's
    right at the T6 level." (Tr. 370).  A study of the lumbar spine revealed "slight rotoscoliosis
28  with convexity to the patient's left at the L2-3 level."  (Tr. 369).

Dr. Schurgin's office of this additional prescription, she did not tell him that she had increased her use of Vicodin until her next visit to his office.  At that time, Dr. Schurgin reviewed the narcotic contract with Plaintiff and told her that she should have notified him that she required more narcotics prior to increasing her dosage after the emergency room visit. *Id.*  There have not been any other problems regarding compliance with her medication regimen. (Tr. 511).

In February 2000, Plaintiff was treated by Randy Collins, D.O. for her abdominal pain.  Plaintiff previously had a negative CT scan of her abdomen and pelvis, but Dr. Collins reported that Plaintiff's abdomen was "soft with tenderness." (Tr. 288).  In September 2000, Plaintiff's cystoscopy revealed no abnormalities. (Tr. 286).  Dr. Collins noted in June 2000 and again in November 2001 that Plaintiff may suffer from "possible chronic cystitis."  (Tr. 284, 287).

In May 2000, Dr. Battersby referred Plaintiff to James Diede, M.D., a pain management consultant, for Plaintiff's chronic abdominal and leg pain. (Tr. 221-22). Darling has a "[l]ongstanding history of abdominal pain with multipole laparoscopy surgeries for endometriosis, "relative recent history of benign bladder tumors," and hypothyroidism. (Tr. 222).  Dr. Diede noted that fifteen years earlier, Plaintiff had been diagnosed with endometriosis and undergone four laparoscopic surgeries, a hysterectomy, oophorectomy, and appendectomy. *Id.*  Dr. Diede reported no radicular signs or spinal etiology or findings, but believed Plaintiff's lower extremity pain was caused by an abdominal or bladder problem.  *Id*.

Plaintiff also saw Pattabi Kalyanam, M.D. in 2001 for pain management.  Dr. Kalyanam diagnosed chronic lumbar radiculopathy and noted that Plaintiff's pain level was on average a 6 out of 10 and was somewhat improved since being placed on temporary medical leave at work.  (Tr 236-40).

In May of 2001, Plaintiff saw Charanjit Dhillon, M.D. for a neurological examination due to continuing complaints of back pain, pelvic pain, and lower extremity

numbness.  (Tr. 228-30).  At this point, Plaintiff had been on disability from work for three weeks. (Tr. 229).  Plaintiff's neurological examination was normal and an examination of the lumbar spine was "unremarkable." *Id.*  On Dr. Dhillon's referral, Plaintiff had an MRI exam of her pelvis, which was normal.  (Tr. 231).  Finally, Dr. Dhillon concluded that "there is no electrophysiological data to support lumbosacaral radiuclopathy," but could not determine the source of Plaintiff's symptoms and so recommended a second psychiatric consultation or, in the alternative, a referral to a chronic pain clinic for pain management. (Tr. 226-27).

In May 2001, Dr. Battersby referred Plaintiff to John Porter, M.D. and Christine Harter, M.D. of the Phoenix Rehabilitation Center.  Dr. Porter noted in his May 2001 report that Plaintiff "presents with chronic lower extremity pain felt to be myoligamentous and myfascial patterns." (Tr. 333).  Dr. Harter saw Plaintiff the next month and increased Plaintiff's OxyContin prescription and gave her a prescription for Vicodin. (Tr. 249).  Plaintiff started trigger point injections with Dr. Halvorson in July 2001 and by August, Dr. Harter noted that Plaintiff's myofascial pain syndrome was "somewhat improving with trigger point injections, but still requiring Soma and chronic opioid therapy." (Tr. 242).  In the end, the trigger point injections were not successful as John Porter, M.D. reported that Plaintiff "did not respond to [them] and is chronically maintained on pain medication, which really offers her temporary relief at best."  (Tr. 329).

On March 13, 2003, Dr. Porter reported that Plaintiff had back pain which limited her to less than one hour of sitting, less than one hour of standing and less than one hour of walking in an eight hour workday. (Tr. 380-81).  Dr. Porter agreed with Dr. Battersby that Plaintiff's ability to work "would be limited and probably not [be] an option for her" (Tr. 330); Dr. Porter believes the pain is "chronic and permanent." (Tr. 328).   In October 2003, Dr. Porter opined in a Medical Assessment questionnaire that Plaintiff could not

work due to diffuse lower back pain, pelvic pain, referred lower extremity pain, and severe thoracic scoliosis.  (Tr. 413-14).

Plaintiff also saw P.J. Bowman, D.O. in September 2002 for an orthopedic consultation relating to her chronic back pain. (Tr. 382-83).  Dr. Bowman ordered X-Rays which showed a "32 degree thoracic rotoscoliosis and lumbar scoliosis," and recommended referral to a surgeon for spinal fusion. *Id.*.

In November and December 2002, Plaintiff saw Oscar Gluck, M.D., and John Tesser, M.D., of the Arizona Rheumatology Center.  (Tr. 384-90).  Dr. Gluck diagnosed fibromyalgia after finding that she had "18 of 18 positive prescribed fibromyalgia tender points," as well as diffuse musculoskeletal pain without apparent alternative cause . . ." and therefore "appears to fit the American College of Rheumatology criteria for fibromyalgia." (Tr. 389-90).  Dr. Tesser confirmed the same. (Tr. 384).

Two medical consultants (physicians' names illegible) completed RFC Report forms, one on September 17, 2001, and another on June 26, 2002. (Tr. 253-60, 337-43). Both listed diagnoses of lower abdominal pain (endometriosis) and bilateral [lower extremity] leg pain; neither mentioned fibromylagia and one did not address scoliosis. *Id.* Both RFC Reports established the same exertional limitations on Darling, which were significantly less restrictive than the assessments of the treating physicians.

The 2001 RFC medical consultant did not answer the question on the RFC form regarding whether he had access to opinions of Plaintiff's treating physicians (Tr. 259); if the consultant had answered that such opinions were in the file, he would have had to contrast his conclusions with those of the treating doctors if they were significantly different. (See Tr. 259, 343).  The 2002 RFC medical consultant answered "No" to the same question; he did *not* have access to the opinions of the treating physicians. (Tr. 343). Given Darling's long history of medical treatment, one wonders why a consultant would fail to answer the question regarding access to the opinions of her treating physicians, or why the opinions would not be included in the file.

**C.  Mental Health Treatment / Medical Records**

On October 10, 2001, Plaintiff underwent a psychological evaluation by Alexander Piatka, Ph.D.  Dr. Piatka made no diagnoses (Tr. 265-66) but stated that there was "no evidence of a psychotic disturbance." (Tr. 265).  Piatka reported:

> It is difficult to clearly rule out the presence of a Somatoform Disorder. There are no medical records suggestive of physical complaints or pain complains [*sic*] which are in excess of what would be expected based on the history, physical examination, or laboratory findings.  It is somewhat surprising that the [Plaintiff] does not demonstrate a greater degrees [*sic*] of distress or depressive symptoms associated with a chronic pain syndrome.  However, this could reflect relatively good pain management at the present times [*sic*], relatively low levels of stress, and adequate coping strategies.  There is a mild dramatic quality to her presentation at times and I cannot rule out symptom magnification.  I cannot definitively rule out diagnoses of Pain Disorder Associated With Both Psychological Factors and a General Medical Condition, or an Undifferentiated Somatoform Disorder.

*Id.*

**D.  Testimony of Medical Expert**

Hershel Goren, M.D. testified at Plaintiff's final ALJ hearing on August 2, 2004.  Based on his "reading of the record," Dr. Goren concluded that Plaintiff's "major problem was addiction to narcotics prescribed by [her] physicians" (Tr. 503).  Dr. Goren supports this conclusion with two physicians' statements in the record where they "are at least somewhat aware that...there may be an emotional, that is, non-physical cause for the pain." (Tr. 504).

Dr. Schurgin noted on April 20, 2000, that he had some concern with treating Plaintiff long term with sustained release narcotics because she "tends to develop tolerance to the medications that she has already received[,]" and that he "keep[s] coming back to the same idea which is that the patient does have at least some emotional basis for her pain, which she denies." (Tr. 215).  The second statement is by Dr. Dhillon, who noted that "[p]sychogenic causes [of Plaintiff's pain] should again be revisited" and recommended a second psychiatric consultation. (Tr. 227).

Dr. Goren does not dispute the diagnoses of fibromyalgia, myofascial and myoligamentous pain, and chronic pain syndrome.  (Tr. 509-10).  Dr. Goren nonetheless found that Plaintiff could work at a "light exertional level." (Tr. 506).  Dr. Goren limited Plaintiff to lifting or carrying twenty pounds occasionally and ten pounds frequently; occasional stooping, kneeling, crouching and crawling; and precludes Plaintiff from being around unprotected heights. *Id.*

**E.  Testimony of Plaintiff**

At the third ALJ hearing, Plaintiff testified that she stopped working as a records clerk in a law firm because her boss let her know that she was not doing her job and should get the help she needed. (Tr. 490).  Her boss was unhappy with her significant number of absences due to her condition. *Id.*  Furthermore, Dr. Battersby suggested that Plaintiff stop work due to her severe lower abdominal, leg, back, and arm pain.  (Tr 449, 490).

Plaintiff testified that she has problems sleeping at night and spends a significant amount of time resting in a bed, on the couch or in a recliner. (Tr. 492-94, 498-99).  She naps regularly for one to two hours in the early afternoon. (Tr. 492).  Plaintiff testified that she has difficulty standing for more than twenty minutes and can walk or sit for only fifteen to twenty minutes before she needs to change positions. (Tr. 491).  She can lift approximately ten pounds without hurting herself. *Id.*

Plaintiff's pain is on average between a seven and eight on a one-to-ten scale that goes up and down during the day.  (Tr. 493).  She  describes her abdominal pain as "piercing, sharp,...[and] like somebody's just kind of digging their fist into it and pushing and gnawing on it" and her leg pain as a "sharp, spiky pain" that aches. *Id.*  She routinely stays home six days a week and cooks simple meals in the microwave.  She cleans on occasion and gets help from her mother, with whom she lives.  (Tr. 494).  Her mother usually drives her if she needs to go

somewhere. (Tr. 501).  Plaintiff flew to Canada one time with her mother and also traveled to California once or twice via car, where she laid down in the car.  (Tr. 497-98).  She can no longer enjoy pastimes such as gardening or painting.  (Tr. 457).  Plaintiff does craft work from her recliner once in a while.  (Tr. 498-99).

**F.  Statement of Shirley Darling**

Shirley Darling is Plaintiff's mother.  Ms. Darling completed a questionnaire about Plaintiff in September 2001.  In this questionnaire, Ms. Darling notes that when her daughter's "pain is excessive (often), [she] is slack in personal hygiene and grooming." (Tr. 179).  Her daughter now takes "sponge baths and only showers a couple times a week." (Tr. 183).

Her mother reports Plaintiff "cannot work because she can't be on her feet for very long and has trouble sitting - except in a recliner. (Tr. 181).  Plaintiff's mother also stated that her daughter has difficulty completing tasks such as cleaning or performing tasks requiring concentration. (Tr 185).  Plaintiff does do some limited tasks but only when necessary. (Tr. 183).  Ms. Darling noted that Plaintiff stays in bed nine to twelve hours per day and "tries to hide her pain but sometimes it is very evident because she withdraws or becomes 'snapish [*sic*].'" (Tr. 181-82).

**G.  Testimony of Vocational Expert**

Marilyn Kinnier, a Vocational Expert, ("VE") testified at Plaintiff's final ALJ hearing.  The VE was presented with three hypothetical examples by the ALJ. (Tr. 512-19).

The first hypothetical presented an individual with the same age, work experience, and educational background as Plaintiff who could "lift 20 pounds occasionally, 10 pounds frequently; sit, stand, and/or walk six hours in an eight-hour day . . . no ladders, ropes, or scaffolds; occasional stairs, ramps; occasional

bending, crouching, crawling, kneeling; and no unprotected heights." (Tr. 515). The VE determined that such an individual would be able to perform at a light exertional level, clerical jobs, which include secretarial and records management. *Id.*

The second hypothetical presented the same individual as the first, but added the restriction which prohibits high production quotas. (Tr. 516). The VE found that this would preclude the law office job, but that there were other semi-skilled "general clerk-type jobs" that would be appropriate for such an individual. *Id.*

The third proposed hypothetical was that of an individual who would "miss four or more days of work per month because of pain or other related symptoms to the impairments or could not complete assigned tasks in an eight-hour day four or more days per month. . ." (Tr. 516-17). The VE stated that there would be no work for such an individual. (Tr. 517).

**V. ANALYSIS**

When evaluating a claim for a Period of Disability and Disability Insurance Benefits, the claimant has the burden of establishing disability. A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The ALJ must engage in a five-step evaluation pursuant to 20 C.F.R. §§ 404.1520 and 416.920 to determine whether the claimant is disabled. In the first four steps of the analysis the claimant has the burden of demonstrating (1) that the claimant has not engaged in substantial gainful activity since filing for benefits; (2) that the claimant's alleged impairment is sufficiently severe to limit ability to

work; (3) that, if a severe impairment is found, is it included in the Listing of Impairments and meets the duration requirement; (4) that, if the impairment is not on the Listing of Impairments, after considering all impairments in combination and determining the claimant's Residual Functional Capacity ("RFC"), whether the claimant can no longer perform past relevant work.  Finally, the burden shifts to the Social Security Administration to demonstrate (5) that the claimant is not disabled and that claimant can engage in some type of substantial gainful activity that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1560(c)(2).

In this case:  *First*, it is uncontroverted that the plaintiff has not engaged in substantial gainful activity since filing for benefits.

*Second*, the ALJ found that Plaintiff has certain impairments sufficiently severe to limit her ability to work: "disorders of the back, fibromyalgia, history of a chronic pain disorder, and possible prescription narcotic addiction[.]" (Tr. 33). Plaintiff argues that endometriosis should have been included in this list of severe impairments.

*Third*, it is undisputed that Plaintiff's severe impairments, either alone or in combination, are not included in the Listing of Impairments, and therefore the evaluation must proceed to step 4. (Tr 33).

*Fourth*, the ALJ found that Plaintiff retains an RFC that allows her to do "light work," and is thus capable of performing past relevant work as a secretary, child care giver, and records management clerk. (Tr. 37).  The analysis involves consideration of Plaintiff's symptoms, the objective medical evidence, and medical opinions by acceptable medical sources.  Because he found that Plaintiff could perform past relevant work, he ended his analysis here.  Plaintiff maintains that the evidence requires the analysis to continue to step 5.

1    *Fifth*, had the ALJ found that Plaintiff did not have the RFC to perform past

2    relevant work, the burden shifts to the Social Security Administration ("SSA") to

3    demonstrate that Plaintiff was not disabled and that, although no longer able to

4    perform past relevant work, could engage in some type of substantial gainful

5    activity that exists in significant numbers in the national economy. The analysis

6    here is essentially the same as that in the fourth step: review of symptoms,

7    objective evidence, and medical opinions.

8        Besides arguing that endometriosis should have been included in the list of

9    severe impairments, Plaintiff alleges that the ALJ failed to accord adequate weight

10   to the opinions and assessments of her treating physicians. (Dkt. 16).  She alleges

11   the same with respect to her own testimony and information provided by her

12   mother. (Dkt. 16).

13   **A.  Inclusion of Plaintiff's endometriosis diagnosis in list of impairments**

14

15       At step two of the disability analysis, the ALJ is required to determine

16   which, if any, of Plaintiff's impairments are sufficiently "severe" to limit one's

17   ability to work.  20 CFR §§ 404.1520(c), 416.920(c).

18       If a severe impairment exists, *all* medically determinable impairments must

19   be considered in the remaining steps of the sequential analysis.  20 CFR §§

20   404.1523 and 416.923 (emphasis added); *see* 42 U.S.C. § 423(d)(2)(B) ("the

21   Commissioner of Social Security  shall consider the combined effect of all of the

22   individual's impairments without regard to whether any such impairment, if

23   considered separately, would be of such severity.").  It follows that the ALJ must

24   consider Plaintiff's endometriosis, a diagnosed impairment, whether or not it is

25   classified as "severe" in his disability analysis.  Although the ALJ did not list

26   endometriosis as a severe impairment, he referred to the condition four times in his

27   decision.

28

**B. Physician opinion evidence**

In general, a treating physician's opinion is afforded more weight than that of an examining non-treating physician, whose opinion, in turn, is afforded more weight than that of a non-examining (or "consulting") physician. *See Orn* at 631 (citing 20 C.F.R. § 404.1527(d)(1)-(2)).  Additionally, "[i]f a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight.'" *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ arguably rejected the opinions of Plaintiff's treating physicians, Dr.Battersby and Dr. Porter, by giving them "little weight." (Tr. 35).  The ALJ did not dispute that the treating physicians' opinions were well-supported by medically acceptable clinical and laboratory diagnostic techniques.  Instead, he refused to give them controlling weight because they were "not supported by the medical evidence in this case," or were inconsistent with the other substantial evidence in the case record.

The ALJs reasons for giving little weight to the opinions of Drs. Battersby and Porter, include: negative straight leg raising tests in Spring 2000; a normal gynecologic health maintenance examination in November 2001; Dr. Porter's February 2002 report that said "there was nothing conclusive in her diagnosis" and that she could do sedentary work; Dr. Gluck's and Dr. Tesser's report that Plaintiff was greatly improved by her current medication; and Dr. Piatka's 2001 opinion that Plaintiff's emotional symptoms would not markedly negatively impact her ability to hold employment.  (Tr. 35).  These "reasons" are not persuasive.

A review of the *entire* medical record, however, reflects that the opinions of Drs. Battersby and Porter are substantially supported by numerous reports from several examining physicians, medical and laboratory test results, and

1   questionnaires completed by Drs. Battersby and Porter. The ALJ should not be

2   one-sided in his analysis.  *See Orn* at 630 ( "a reviewing court must consider *the*

3   *entire record as a whole* and may not affirm simply by isolating a specific

4   quantum of supporting evidence." (internal quotation marks and citations omitted)

5   (emphasis added)).

6       Evidence that substantially supports the opinions of the two treating doctors

7   includes the following:

8       From 2000-2001, Plaintiff experienced chronic pain and was diagnosed

9   with chronic pain syndrome, scoliosis, and endometriosis. Plaintiff saw three pain

10   specialists beginning in 1999, including Drs. Schurgin, Diede, and Kalyanam.

11   Although she began trigger point injections in 2001 for her pain, they were

12   ultimately unsuccessful and she had to revert to pain medications, which offered

13   "temporary relief at best."  (Tr. 329).

14   

15       Furthermore, although Plaintiff had a normal gynecologic maintenance

16   exam with Dr. Collins in 2001, Dr. Collins noted that Plaintiff may suffer from

17   "possible chronic cystitis."  (Tr. 288).  Plaintiff complained to Dr. Collins the day

18   of her exam of an abdominal pain different in quality from the pain she endured

19   due to endometriosis.  It is also clear from the reports of Drs. Porter, Battersby,

20   and Harter that Plaintiff was still suffering from abdominal pain after 2001.

21       Dr. Porter saw Plaintiff in February 2002 and stated that he believed

22   Plaintiff could do sedentary work .  Dr. Porter saw Plaintiff for a follow-up,

23   however, two months later.  At this time, he opined that Plaintiff's chronic

24   abdominal pain was most likely explained as endometriosis and that her symptoms

25   represent a chronic musculoskeletal dysfunction and visceral pain requiring

26   chronic pain management. (Tr. 325).  Dr. Porter added that possible work for

27   Plaintiff includes answering phones, not lifting more than 10 lbs, and limiting any

28   bending, stooping, lifting and squatting.  (Tr. 324-25).  He advised that the type of

work Plaintiff could perform would be a "sedentary, home bound situation where she could sit in a recliner and move about in her home" and an "active workday where she has to go in and carry out activities in a work place would be very difficult." (Tr. 326).

In September 2002, Dr. Bowman reported Plaintiff's scoliosis was severe enough to recommend spinal fusion. (Tr. 383). Plaintiff was finally diagnosed with fibromyalgia in late 2002, substantiating Plaintiff's chronic lower leg pain. In March 2002, Dr. Battersby found that Plaintiff was unable to work, an opinion supported by Dr. Porter in 2003. (Tr. 319, 413).

Therefore, since the two treating doctors' opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in [the] case record, they are assigned controlling weight.

Even if the ALJ had been correct and there was inconsistency in the record, the treating doctor's opinions cannot be ignored; they still merit deference. Social Security Ruling 96-2p, clarifying § 404.1527, provides that a "finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' *not that the opinion should be rejected*. Treating source medical opinions are still entitled to deference . . ." *Orn* at 631-32 (quoting S.S.R. 96-2p at 4 (Cum. Ed.1996), *available at* 61 Fed.Reg. 34,490, 34,491 (July 2, 1996)) (emphasis added).

"Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record. This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence,

1   stating his interpretation thereof, and making findings.  The ALJ must do more

2   than offer his conclusions." *Id.* at 632. (inner quotations and citations omitted).

3   That was not done in this case.

4       To refute a treating physician's opinion and relegate it to less than

5   "controlling weight," there must be "substantial evidence" in the record that

6   reflects another doctor's conflicting opinion. *Id.* (citing 20 C.F.R. §

7   404.1527(d)(2)).

8       "When an examining [non-treating] physician relies on the same clinical

9   findings as a treating physician, but differs only in his or her conclusions, the

10  conclusions of the examining physician are *not* 'substantial evidence.'" *Id.*  For it

11  to be "substantial evidence," the examining physician must provide independent

12  clinical findings as follows: "either (1) diagnoses that differ from those offered by

13  another physician and that are supported by substantial evidence; or (2) findings

14  based on objective medical tests that the treating physician has not herself

15  considered." *Id.* (citations omitted).

16

17      In rejecting the opinions of the two treating physicians, the ALJ relied on a

18  *non-examining*, *non-treating* consulting physician, Dr. Hershel Goren. (Tr. 33-36).

19  Dr. Goren opined that Plaintiff was capable of performing "light work," which

20  clearly contradicts the opinions of Dr. Battersby and Dr. Porter.

21      What is also clear is that none of Dr. Goren's conclusions were based on

22  independent clinical findings.  Dr. Goren did not make any findings based on

23  objective medical tests that the treating physicians did not themselves conduct; in

24  fact, his opinion was founded solely on his "reading of the record."  (Tr. 503).

25      Moreover, although Dr. Goren offered a different diagnosis, that of narcotic

26  addiction, he supported this with only two brief statements from the medical

27  record:  two examining doctors' concerns that there may be a partial emotional

28

basis for Plaintiff's pain.  Dr. Goren's diagnosis is not supported by substantial

evidence in the record; it is mere conjecture.  Even the ALJ, in finding Plaintiff's

severe impairments, listed "*possible* prescription narcotic addiction," (Tr. 33)

(emphasis added), not a resounding affirmation of the doctor's diagnosis.

Dr. Goren proceeded to reach his conclusions regarding Plaintiff's

exertional and postural restrictions, which were significantly less restrictive than

the limitations proposed by Plaintiff's treating physicians. (Tr. 33).  In sum, Dr.

Goren, having never examined Plaintiff, simply relied on the medical record and

disagreed with the various treating physicians' conclusions.  He did not base any

of his conclusions on independent clinical findings.  Consequently, Dr. Goren's

contradicting opinions are *not* "substantial evidence," and therefore do not carry

weight against the opinions of Dr. Battersby and Dr. Porter.

The ALJ's rejection of the opinions by Dr. Battersby and Dr. Porter is not

appropriate.

**C.  Plaintiff's credibility**

The ALJ is responsible for determining credibility and resolving conflicts in

medical testimony.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  If

there is medical evidence of an underlying impairment, the ALJ may not discredit

a claimant's testimony as to the severity of symptoms merely because they are

unsupported by objective medical evidence.  *See Bunnell v. Sullivan*, 947 F.2d

341, 347-48 (9th Cir. 1995).  In the absence of "affirmative evidence that the

claimant was a malingerer, th[e] reasons for rejecting the claimant's testimony

must be clear and convincing."  *Orn* at 635 (internal citations and quotations

omitted).  There is no affirmative evidence that Plaintiff is malingering; the ALJ

must therefore meet the clear and convincing standard.

The ALJ may consider the claimant's reputation for truthfulness, inconsistencies either in the claimant's testimony or between that testimony and claimant's conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains. *Id.* at 636.

The ALJ discredited Plaintiff's allegations of the degree of her impairments and limitations as not credible. The ALJ cited twelve reasons for discrediting Plaintiff's testimony, which are the following:

(1) Plaintiff's reported symptoms to Dr. Diede on May 18, 2000 were, in the opinion of the ALJ, "exaggerated" and Dr. Diede found no spinal etiology explaining her lower extremity pain generation. (Tr. 36). This, however, mischaracterizes Dr. Diede's opinion. Nowhere in Dr. Diede's three page report does he allude to exaggerated symptoms. (Tr. 222-224). In fact, he recommended an abdominal work-up, and although unable to pinpoint an exact cause for the pain, opined that "everything points to an abdominal or bladder mechanism for pain generation." *Id*.

(2) Dr. Kalyanam's August 3, 2000 indication that the Plaintiff's pain was "under control on medications taken as needed;" She testified in 2004 that her "medicine has taken the edge off, but that's about it...[and] that's about all I can hope for at this point in time." (Tr. 491).

(3) Dr. Benson's September 20, 2000 report that subjectively, Plaintiff was "fine at that time." Nevertheless, Plaintiff repeatedly reported pain beginning in the year 2000 through the last date in the record, which is amply supported by physicians' notes.

(4) Dr. Porter's 2001 report that Plaintiff told him there was "no conclusive diagnosis of her lower extremity pain." Although the source of Plaintiff's lower

extremity pain was difficult to diagnose, in 2002 Plaintiff was told she had fibromyalgia by two rheumatologists.

(5) Plaintiff's own June 27, 2001 report that osteopathic manipulative therapy had helped her back pain.  However, alleviation of pain does not mean that the pain has been eradicated with therapy, nor does it reflect, indeed, later medical records confirm, that the pain alleviation was not permanent.

(6) Dr. Halvorson's and Dr. Porter's statements that Plaintiff had a low pain threshold.  This observation notwithstanding, Drs. Battersby, Porter, and Dhillon, as well as Dr. Goren, agree that Plaintiff suffers from chronic pain syndrome.

(7) Plaintiff's normal gynecologic examination in November 2001 with Dr. Collins, despite being on opioids for abdominal pain in August 2001.

(8) two doctors' observations that no physical cause could be found for Plaintiff's symptoms.  This is the same as (4) above.

(9) Plaintiff's ability to move without ambulatory devices.  This carries little weight since it has never been prescribed that Plaintiff use one by any of her physicians.  For a few weeks, Plaintiff did use a cane, given to her by her doctor, when her knees started giving way. (Tr. 500).

(10) Plaintiff's ability to travel.  Although Plaintiff acknowledges she has traveled on two occasions, she did so with the help of her mother, and on the most recent occasion, spent the time lying down in the car.

(11) Plaintiff's ability to sit at the hearing for over an hour despite testifying that she could not sit over an hour.  There is no evidence as to the hearing's duration (how much more than an hour?), whether breaks were taken, if Plaintiff remained seated the entire time, or if Plaintiff was in discomfort.  Such "sit and squirm" jurisprudence has been rejected by this Circuit.  *See Perminter v. Heckler*, 765 F.2d 870, 872 (9th Cir.1985) (ALJ's observations, if contrary to claimant's

statements which are supported by objective evidence, is no basis for denial of

benefits); *Lewis v. Bowen,* 675 F.Supp. 1205, 1209 (C.D.Cal.1987).

(12) Plaintiff's ability to cook her own meals, do laundry, houseclean,

water, shop, drive, run errands, manage her bills, go to church, read, paint, do

crafts, use a computer, and socialize with a friend.  Plaintiff is able to do some

daily activities, but in a much more limited way than she could previously.

An ALJ may reject a claimant's testimony if the claimant is able to perform

daily activities that "are transferable to a work setting." *Fair v. Bowen*, 885 F.2d

597, 603 (9th Cir. 1989).  However, "the mere fact that a plaintiff has carried on

certain daily activities ... does not in any way detract from her credibility as to her

overall disability. One does not need to be 'utterly incapacitated' in order to be

disabled." *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001); *accord*

*Benecke v. Barnhart,* 379 F.3d 587, 594 (9th Cir. 2004).

In April 2001, Plaintiff stated that she usually has to "lay down for short

periods periodically through[out] the day"and if she starts a task, she has to "sit

down or lay down until the pain in [her] legs becomes more manageable."  (Tr.

175-76).  When she goes shopping, which is only if she "really [has] to go get

something," she "pay[s] for it with horrible pain the next day." *Id*.  She is "unable

to drive for long periods or the pain in [her] legs becomes unbearable."  (Tr. 177).

In 2003, at the August hearing in front of the ALJ, Plaintiff testified that she cooks

in the microwave, will do some laundry every once in a while with help from her

mother, rarely drives because she gets "too dizzy," does her craft work "a little bit,

every once in a while" from her recliner, quit painting about two years ago because

she had a hard time controlling the brush, and uses a computer for about ten

minutes once a month. (Tr. 494-9).  The friend she socializes with comes to see

Plaintiff at her home; they do not go out. (Tr. 501).

These proffered reasons by the ALJ do not meet the "clear and convincing" standard; the ALJ mischaracterizes the evidence.

**D.  Shirley Darling's statement**

Plaintiff alleges that the ALJ improperly rejected the statements of Plaintiff's mother.  The ALJ considered, in a limited response, her statements. (Tr. 36). The ALJ found that, although more limited than in the past, the statement supported  the conclusion that Plaintiff was still able to "drive, cook, clean house, shop, read, watch television and listen to the radio, play cards and games, talk on the phone, make jewelry , and do craft projects" based on and supported by Ms. Darling's statement.  (Tr. 36).  Again the record is mischaracterized.  The limitations described by Plaintiff's mother were overlooked or ignored. (Tr. 179-85).

**E.  Conclusion**

The ALJ's reasons for rejecting the opinions of Plaintiff's two treating physicians are not sustained, and his conclusion that Plaintiff was not credible is not supported by substantial evidence in the record.  With no justification to do otherwise, the opinions of Drs. Battersby and Porter must be given controlling weight, and Plaintiff's testimony is credible.  Therefore, it is the Court's finding that Plaintiff is disabled.

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Dkt. 20) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. 14) is **GRANTED**.

**IT IS FURTHER ORDERED** remanding the matter for payment of benefits to Plaintiff.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DATED this 26th day of November, 2007.


_____
Earl H. Carroll
United States District Judge

- 23 -